## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**MICHELLE ASHLEY HUTSON,**

     **Plaintiff,**

**vs.**                             **CIVIL ACTION NO. 2:18-CV-01383**

**NANCY A. BERRYHILL,**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

     **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered October 26, 2018 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Memorandum in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 13, 14)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **GRANT** Plaintiff's request for remand (ECF No. 13), **DENY** Defendant's request to affirm the decision of the Commissioner (ECF No. 14); **REVERSE** the final decision of the Commissioner; and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for the reasons stated *infra*.

1

**Procedural History**

The Plaintiff, Michelle Ashley Hutson, (hereinafter referred to as "Claimant"), protectively filed her application for Title II benefits on December 17, 2014, alleging disability since June 13, 2014, because of "PTSD, Post sepsis syndrome, nerve damage in joints (fingers), memory loss and remembering, high anxiety, lung ab[s]cess, lung scarring, COPD, cannot concentrate, [and] joint pain in legs/knees."[1] (Tr. at 241, 242-243, 256) Her claim was initially denied on June 4, 2015 (Tr. at 168-172) and again upon reconsideration on August 13, 2015. (Tr. at 176-182) Thereafter, Claimant filed a written request for hearing on September 30, 2015. (Tr. at 183-184)

An administrative hearing was held on July 11, 2017 before the Honorable William R. Paxton, Administrative Law Judge ("ALJ"). (Tr. at 104-132) On September 1, 2017, the ALJ entered an unfavorable decision. (Tr. at 73-95) On September 19, 2017, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 240, 419-420) The ALJ's decision became the final decision of the Commissioner on August 30, 2018 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-7)

On October 25, 2018, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 10, 11) Subsequently, Claimant filed a Memorandum in Support of Judgment on the Pleadings (ECF No. 13), in response, the Commissioner filed a Brief in Support

---

[1] In her Disability Report – Appeal, submitted on June 18, 2015, Claimant alleged that she experienced "[i]ncreased anxiety, panic attacks, migraines, shortness of breath, edema, loss of vision." (Tr. at 285) She also alleged that since June 4, 2015 that she suffered an "Incision Hernia" and uses a shower chair. (Id.) Claimant asserted that these symptoms increased, including more pain in her joints, hands, stomach, right arm and decreased range of motion in her Disability Report – Appeal submitted on October 1, 2015. (Tr. at 304)

of Defendant's Decision (ECF No. 14), to which Claimant filed her Reply (ECF No. 15). Consequently, this matter is fully briefed and ready for resolution.

## Claimant's Background

Claimant was 43 years old as of the alleged onset date and considered a "younger person" throughout the underlying proceedings. See 20 C.F.R. § 404.1563(c). (Tr. at 134) Claimant has a high school education and had worked as an analyst and then a claims adjuster for Blue Cross Blue Shield for nearly 14 years. (Tr. at 109)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant

work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in

4

which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listing of Impairments in appendix 1 to this subpart.

(4) When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision

must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2019. (Tr. at 78, Finding No. 1) Next, the ALJ determined that Claimant had not engaged in substantial gainful activity since the alleged onset date of June 13, 2014. (Id., Finding No. 2)

At the second inquiry, the ALJ found that Claimant had the following severe impairments: restrictive pulmonary disease/emphysema; history of sepsis syndrome; incisional hernia; headaches; fibromyalgia; connective tissue disease; history of deep venous thrombosis; chronic cervical and thoracic strain; osteoarthritis; anxiety disorder; attention deficit hyperactivity disorder (ADHD); post-traumatic stress disorder (PTSD); and major depressive disorder. (Id., Finding No. 3)

At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 79, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform sedentary work

except she can never climb ladders, ropes, or scaffolds. She can occasionally climb ramps, stairs, balance, stoop, kneel, crouch, and crawl. She must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, fumes, odors, dust, gases, poor ventilation, and hazards such as dangerous machinery and unprotected heights. She is limited to understanding, remembering, and carrying out simple instructions. She is limited to completing simple, routine, and repetitive tasks and to performing work that does not involve a rapid pace or strict production quotas. She is limited to occasional interaction with supervisors and coworkers, and to no interaction with the public. In addition, she must work in a stable work

environment where there would be only occasional changes to the routine work setting.

 (Tr. at 81, Finding No. 5)

At step four, the ALJ found Claimant was not capable of performing her past relevant work. (Tr. at 86, Finding No. 6) In addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience and RFC, the ALJ determined that there were other jobs that existed in significant numbers in the national economy that Claimant could perform. (Id., Finding Nos. 7-10) Finally, the ALJ determined Claimant had not been under a disability from June 13, 2014 through the date of the decision. (Tr. at 87, Finding No. 11)

**Claimant's Challenges to the Commissioner's Decision**

In support of her appeal, Claimant asserts three main grounds of error.

For the first ground, Claimant argues that the ALJ's RFC assessment is deficient insofar as the ALJ failed to assign a weight to the opinion evidence provided by the State agency psychological consultative examiner, Paul Dunn, Ph.D., and also failed to explain why he found Claimant less limited than the State agency psychological consultants, whose opinions were afforded "great weight." (ECF No. 13 at 7-12) Claimant contends that the ALJ failed to comply with legal authority by not providing an explanation for his reasons why not all the limitations identified by the psychological consultants were adopted. (Id. at 12-13) Additionally, the ALJ did not explain why he determined Claimant's treating source's opinion, Fred Lee, Ph.D., was inconsistent with Dr. Dunn's opinion, when both opinions were consistent on significant findings. (Id. at 13-14) Further, Dr. Lee's opinion was corroborated by the State agency consultant opinions. (Id. at 15) In sum, the ALJ failed to properly evaluate the examining psychological opinions of record and this error warrants remand. (Id. at 15-16)

7

Next, Claimant argues that because the ALJ did not provide an adequate explanation for the RFC findings with respect to Claimant's manipulative limitations despite evidence supporting same, which precludes meaningful review by this Court; since substantial evidence does not support the RFC assessment or the step five denial, remand is necessary. (Id. at 16-18)

Finally, Claimant contends that despite the vocational expert's testimony otherwise, the jobs identified were not consistent with the controlling RFC upon review of the Dictionary of Occupational Titles ("DOT"). (Id. at 18) Pursuant to Social Security Ruling ("SSR") 00-4p, the ALJ was required to resolve any apparent inconsistencies between the vocational expert's testimony and the DOT, and because the ALJ did not fulfill this obligation, the step five finding is not supported by substantial evidence. (Id. at 19-20)

Claimant requests this Court reverse the final decision for an award of benefits or to remand to correct these errors. (Id. at 20)

In response, the Commissioner asserts that the ALJ properly evaluated the opinion evidence, gave explanations for the weights assigned to them, and that Claimant mistakenly characterizes the psychological consultative examiner's report as an opinion, when the Regulations do not define it as such. (ECF No. 14 at 9-11) In assessing Claimant's RFC, the ALJ explicitly noted the medical evidence of record that supported his determinations, which included the psychological consultative examiner's findings, as well as the State agency psychological opinion evidence. (Id. at 11) Further, the Commissioner argues that when formulating the limitations in the RFC, which remains the Commissioner's sole determination, the ALJ was not obligated to adopt the entirety of the medical opinions even if he assigned them great or substantial weight. (Id. at 12-13) The ALJ's RFC assessment adequately accounted for Claimant's psychological

limitations given the evidence. (Id. at 13-14) With regard to the treating source opinion evidence, the Commissioner argues that there were conflicts with the other evidence of record, including the treatment records, and the ALJ explained why he gave Claimant's treating psychologist limited weight. (Id. at 14-15)

With regard to manipulative limitations, the Commissioner argues that the ALJ noted Claimant's complaints, the diagnoses and lack thereof in the medical records, and appropriately found that there were no significant functional deficits related to her alleged manipulative limitations that warranted work-related limitations in the RFC assessment. (Id. at 15-17)

Finally, the Commissioner asserts that the vocational expert's testimony was consistent with the jobs identified from the DOT, and there were no apparent conflicts necessitating the ALJ's resolution. (Id. at 17-18) Further, neither Claimant nor her representative addressed any conflicts at the hearing or to the Appeals Council. (Id. at 18-20)

In sum, the Commissioner contends that the final decision is supported by substantial evidence and asks this Court to affirm. (Id. at 20)

In reply, Claimant contends that Dr. Dunn's opinion does fall within the definition of medical opinion under the Regulations, and yet the ALJ failed to assign it any weight. (ECF No. 15 at 1-2) Because the ALJ clearly relied heavily on Dr. Dunn's opinion in his assessment of the paragraph B criteria, he was obligated under the Regulations to explain why certain findings were adopted and others were not. (Id. at 2-3) Further, with regard to the State agency opinion evidence, which was given great weight, the ALJ was also obligated to explain why he did not adopt other portions of those medical opinions; because he failed to do so, remand is necessary. (Id. at 3-4)

With regard to Dr. Lee's opinion, Claimant points out that the ALJ relied solely on the

normal findings in the treatment record, and ignored the abnormal findings within the same record, which this Circuit[2] has found to be an inadequate reconciliation of the conflicting evidence, thus necessitating remand. (Id. at 4-5) Moreover, because the ALJ ignored that Dr. Lee's opinion was supported by other medical opinions of record, his weighing of this evidence was lacking, and warrants remand. (Id. at 5)

Finally, Claimant points out that the Commissioner's argument that his representative failed to raise the issue of conflicts in the vocational expert's testimony and the DOT has been rejected by the Fourth Circuit and this Court[3], and it remains the ALJ's duty to resolve any apparent conflicts in the evidence. (Id. at 5-7)

Claimant asks this Court to remand for correction of these errors, as the final decision is not based upon substantial evidence. (Id. at 7)

**The Relevant Evidence of Record**[4]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

Hospitalization for Septic Shock:

On June 15, 2014, Claimant presented with signs of cholangitis and biliary duct dilation, but became septic. (Tr. at 421) She then developed acute hypoxic and hypercapnic respiratory failure. (Id.) She was discharged to a rehabilitation center on July 29, 2014. (Tr. at 422, 606)

At the rehabilitation center, Claimant had "minimal deficits." (Tr. at 606) It was noted that

---

[2] Lewis v. Berryhill, 858 F.3d 858, 869-870 (4th Cir. 2017); see also Testamark v. Berryhill, 736 F. App'x 395, 398-399 (4th Cir. 2018); Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018).

[3] Pearson v. Colvin, 810 F.3d 204 (4th Cir. 2015); Cunningham v. Berryhill, No. 3:16-cv-02525, 2017 WL 1259587, at *11 (S.D.W. Va. Mar. 31, 2017); see also McComas v. Berryhill, No. 2:15-cv-14150, 2017 WL 1181499, at *12 (S.D.W. Va. Mar. 28, 2017).

[4] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

"[s]he was fairly independent, needed some therapy to get her back on her feet and she had an uneventful nursing home stay." (Id.)

Stephen Nutter, M.D., Consultative Examiner:

On May 13, 2015, Dr. Nutter provided an internal medicine examination on behalf of the Agency. (Tr. at 830-840) Dr. Nutter's diagnostic impressions were restrictive pulmonary disease, chronic cervical and thoracic strain, abdominal pain, and osteoarthritis. (Tr. at 834) Regarding Claimant's complaints of joint pain, Dr. Nutter noted she had some pain and tenderness and decreased range of motion of the knees, some Heberden's nodes in the hands, and that she was unable to squat because of knee and back pain. (Id.) He noted that these "[f]indings likely represent osteoarthritis. There is no evidence of rheumatoid arthritis. On physical exam, there are no rheumatoid nodules, capsular thickening, periarticular swelling or tophi. There is no ulnar deviation." (Id.)

Paul Dunn, Ph.D. Consultative Examiner:

On May 17, 2015, Dr. Dunn evaluated Claimant on behalf of the Agency. (Tr. at 822-829) She reported that she was laid off in March 2014. (Tr. at 823) Dr. Dunn found Claimant to be a good historian with a good work history.  (Tr. 822, 825) She had no mental health treatment until 2014 and reported that she had been traumatized by the septic event last June and also by her job loss. (Tr. at 825) After her septic shock hospitalization, Claimant reported anxiety, depression, PTSD, and nightmares associated with her being on life support. (Tr. at 823-824) Dr. Dunn conducted a mental health examination and reported the following:

> Behavior: She was restless in the exam as far as her motor activity is concerned. She by observation appears to have an average level of energy during the exam. Emotional State: Facial expression was sad throughout the exam. She cried during the evaluation. Affect: Affect was labile. Mood: Depressed. Attitude: Rapport was

easily established. She was cooperative in the evaluation. She exhibited an average level of appropriate focused eye contact. <u>Speech</u>: Speech was clear, coherent, rapid much of the time, but of normal volume and average verbal fluency. <u>Orientation:</u> She was oriented to place, time, and circumstance, but not to the name of this examiner. <u>Thought Process:</u> She was disorganized at times and her thought processes are the way she answered questions and tended to ramble at times, but there were no significant signs or symptoms of any thought disorder or flight of ideas or anything related to ADD or to psychotic thought disorder. <u>Perceptual:</u> The claimant does not exhibit any perceptual disturbance and she does not endorse any history of auditory or visual hallucinations. <u>Concentration:</u> Moderately deficient based on the claimant obtaining a standard score of 5 on the Digit Span subtest of the WAIS-IV. <u>Immediate Memory:</u> Within normal limits based on the claimant recalling 4 of 4 words immediately after they were presented. <u>Recent Memory:</u> Severely deficient based on the claimant recalling only 1 of 4 words after a 10-minute delay. <u>Remote Memory:</u> Mildly deficient as evidenced by the claimant's difficulty in recalling some of her personal historical data. <u>Judgment:</u> Moderately deficient based on the claimant obtaining a scaled score of 4 on the comprehension subtest of the WAIS-IV. <u>Persistence:</u> Within normal limits based on observation of the claimant's ability to stay on task and make consistent effort during the objective exam. <u>Pace:</u> Within normal limits based on observation the claimant's average pace during the objective exam.

(Tr. at 825-826) He also reported that Claimant was mildly deficient in social functioning during the examination. (Tr. at 826)

Dr. Dunn assessed Claimant with major depressive disorder, recurrent, and anxiety disorder secondary to her medical problems and loss of employment. (<u>Id</u>.) His prognosis was guarded. (<u>Id</u>.)

<u>State Agency Psychological Consultants:</u>

At the initial and reconsideration levels in May 2015 and August 2015, James W. Bartee, Ph.D., and Ann Logan, Ph.D., respectively, evaluated Claimant's then-existing records. (Tr. at 141-143, 145-148, 159-161, 163-165) Dr. Bartee determined that Claimant had mild restrictions in her activities of daily living and moderate limitations in maintaining social functioning and concentration, persistence, or pace. (Tr. at 142) Dr. Bartee stated Claimant would be moderately limited in her ability to understand and remember detailed instructions; to carry out detailed

instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting (Tr. at 146-147) Dr. Bartee additionally provided the following narratives in support of his opinions: Claimant can learn and understand simple, routine instructions, retaining 1-2 steps in memory (Tr. at 146); Claimant can maintain sufficient focus to complete the tasks described above in a routine work-like environment with period breaks across a normal work-related schedule in a setting with minimal expectations for social interaction (Tr. at 147); Claimant can maintain brief, superficial contacts with supervisors and coworkers in a non-confrontational setting and contact with the general public should be minimal or avoided (Id.); and Claimant can adjust to infrequent, limited changes in routine and task structure if given time to become familiar. (Id.)

In August 2015, Dr. Logan affirmed Dr. Bartee's assessment without revision. (Tr. at 163-165)

Treating Psychologist, Fred Lee, Ph.D., Opinion Evidence:

In September 2015, Claimant's psychologist Dr. Lee completed a Mental Residual Functional Capacity Assessment form wherein he opined that Claimant had marked limitations in her ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek; and respond appropriately to changes in the work setting. (Tr. at 951-952)

Dr. Lee opined Claimant had moderate limitations in her ability to: remember work-like procedures and locations; understand and remember very short and simple instructions; carry out very short and simple instructions; sustain an ordinary routine without special supervision; make simple work- related decisions; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers without distracting them; maintain socially appropriate behavior; and be aware of hazards, travel in unfamiliar places, and set realistic goals or make independent plans. (Id.) He also found that Claimant had no limitations in her ability to ask simple questions or request assistance. (Tr. at 952)

In support of his assessment, Dr. Lee provided a two-page hand-written narrative. (Tr. at 953-954) He explained that Claimant "was administered a computer based test of attention on March 2, 2015 which yielded a 99.9% probability that a significant attention problem exists and likely to be manifested by easy distractibility, restlessness, memory difficulties, and tendency toward flitting from one activity to another." (Tr. at 953) Dr. Lee further explained that Claimant completed additional psychological testing that confirmed severe clinical syndromes and personality disorders that support "a Bipolar Spectrum condition and specifically a bipolar I Disorder Mixed so that mood instability features prominently in [Claimant's] difficulties" and "[f]urther anxiety and depressor symptoms are prominent and long standing with [Claimant's] anxiety giving rise to somatoform symptom development." (Tr. at 953-954) Moreover, Dr. Lee stated that along with Claimant's difficulties with posttraumatic stress disorder with flashbacks, social anxieties, and avoidance, Claimant "is likely experiencing some breakdown in cognitive organization with her vulnerable to increased agitation, impulsiveness, rule breaking behavior, and

14

social misconduct possibly linked to her mania or central nervous system compromise of some sort that would be having frontal dis-inhibitory effects." (Tr. at 954)

Treatment Notes from Therapy Sessions dated March 2015-June 2017:

On March 2, 2015, Claimant sought therapy for anxiety and PTSD symptoms following her June 2014 medical issues. (Tr. at 976) She reported feeling high strung, easily overwhelmed, nervous, and having nightmares and flashbacks concerning her time in the hospital. (Id.) Therapy with Dr. Lee was approved. (Tr. at 979) Testing for ADHD (Tr. at 980-982) revealed a 99.9% chance "that a significant attention problem exist[ed]." (Tr. at 983)

On September 9, 2015, Claimant complained of memory loss that began after her hospitalization in June 2014. (Tr. at 992) On examination, her insight and judgment were fair, but she was anxious and forgetful. (Id.) She was prescribed medications for symptoms of ADHD. (Tr. at 993)

On September 23, 2015, Claimant reported that her medications for ADHD and anxiety had helped and that her sleep had improved. (Tr. at 994-995) In October 2015, Claimant again reported improvement on her medications, stating that her medication was "helping my concentration." (Tr. at 996)

In November 2015, she reported her mood was "a lot better." (Tr. at 998) She could better complete tasks, but still cried and worried a lot. (Id.) On examination, she was neat in appearance, pleasant in demeanor, had a stable mood, an appropriate affect, and fair insight and judgment. (Id.)

In December 2015, Claimant reported that her "concentration is better." (Tr. at 1000) On examination, she was again neat in appearance, pleasant in demeanor, had a stable mood, an appropriate affect, and fair insight and judgment. (Id.)

The same examination results were reported in January, February, and March 2016. (Tr. at 1002, 1005) In January, Claimant was still having crying spells, but she described her mood as "not bad." (Tr. at 1002) By February, Claimant was "pretty good" and her sleep was improved. (Tr. at 1004) In March, Claimant was "pretty good"; she could concentrate better, her sleep was improved, and she felt rested. (Tr. at 1006)

In April 2016, Claimant reported good focus, occasional panic, and better sleep. (Tr. at 1298) In May 2016, Claimant reported that her anxiety "comes and goes" and that "it doesn't stay like it used to." (Tr. at 1300) On examination, she was neat in appearance, pleasant in demeanor, had a stable mood, an appropriate affect, and fair insight and judgment. (Id.)

On June 8, 2016, Claimant's mood was sad and her affect appropriate. (Tr. at 1302) She was cooperative and her insight and judgment were fair. (Id.) Her dog had passed away, but her mood was "pretty good" and she was sleeping better. (Id) Her mood was better in July 2016, and she stated that her "focus is a lot better." (Tr. at 1304)

In August 2016, Claimant stated that she was forgetting things and that her family pointed out memory problems since her release from the hospital in 2014. (Tr. at 1306) On examination, Claimant was neat in appearance, pleasant in demeanor, had a stable mood, an appropriate affect, and fair insight and judgment. (Id.)

In November 2016, Claimant's mood was "not too bad." (Tr. at 1386) She was still having memory issues. (Id.) Later that month, she had many people over for Thanksgiving and had a good time. (Tr. at 1404) Her focus was good; her mood was stable, her affect appropriate, and her insight and judgment were fair. (Id.)

In February 2017, Claimant stated: "I'm fine." (Tr. at 1446) Her focus was good and she

slept well. (Id.) On March 27, 2017, she was looking forward to a vacation, and her focus and sleep were good. (Tr. at 1448) In April 2017, Claimant stated that she still had weird dreams, but felt better. (Tr. at 1413) Her examination was unchanged. (Id.) Claimant's May 2017 report was much the same; she was good, had anxiety, and her focus was "good." (Tr. at 1452)

On June 26, 2017, Claimant reported that things were "going pretty good." (Tr. at 1455) Her mood was "mostly good" and her focus was fair, but she had a lot of anxiety over a diagnosis of connective tissue disease. (Id.) On examination, she was neat in appearance, pleasant in demeanor, had a stable mood, an appropriate affect, and fair insight and judgment. (Id.)

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that she last worked as a computer analyst and claims adjuster for a health insurance company for 14 years and that she had not worked since she filed her application for disability benefits, June 13, 2014. (Tr. at 109) She stated she had a driver's license and was able to drive to the store or to visit her aunt. (Tr. at 109-110) She indicated her husband had driven her to the hearing. (Tr. at 110)

Claimant explained that other people told her that she had memory problems, and she could not remember the stories they would tell her. (Id.) She admitted she had instances where she would forget why she entered a room but was unsure how often this happened. (Tr. at 110-111) She stated there had been times that she could not remember instructions and needed to be reminded. (Tr. at 111) She stated she had little containers for her medications, and her husband helped her with appointments. (Tr. at 111-112) She explained that she had problems with her emotions and crying related to fear that something was happening to her that she had not experienced prior to be

hospitalized. (Tr. at 112) She stated she became nervous in public situations and groups of people and sometimes had to leave stores if she began to panic. (Tr. at 113) She confirmed she had been diagnosed with posttraumatic stress disorder and stated that she worried about being back in an ambulance. (Tr. at 113-114)

Claimant stated she had two hernias that made it difficult to lift anything. (Tr. at 114) She stated she wore a binder, but it embarrassed her. (Tr. at 115) Claimant complained of pain in her fingers and her neck. (Tr. at 115-116) She described weakness and tightness and throbbing pain in her fingers that affected her ability to pick things up. (Tr. at 116) She stated she also dropped things and difficulties opening a can or a jar. (Tr. at 117) She stated she could write but cramped up. (Id.) Claimant explained that she often had tightness, stiffness, and pain in her neck as well that worsened after sleeping or when she turned certain ways. (Tr. at 117-118)

She described breathing problems, including shortness of breath if she walked very far. (Tr. at 118-119) She stated she had trouble breathing after walking the length of three houses on her road. (Tr. at 119) Claimant also stated she had problems sleeping due to pain and weird dreams and needed naps during the day. (Tr. at 119-120) She stated she experienced stiffness in her joints when standing or sitting for prolonged periods. (Tr. at 120) She admitted she needed assistance with carrying a laundry basket and vacuuming was becoming harder for her to do. (Id.) She stated her husband did most of the cooking, but she could cook some things. (Tr. at 121) Claimant explained that some of the pans were heavy, and she could not reach up very well. (Id.)

Claimant's Husband's Testimony:

Claimant's husband, Hershel Hutson, testified he had been married to Claimant for 25 years. (Tr. at 121-122) He explained Claimant did not know that she was having memory problems.

(Tr. at 122) For example, Claimant would tell him something and then tell the story again moments later but would have no memory of it. (Id.) Mr. Hutson explained, "She didn't know she forgot because she doesn't remember that she said it." (Tr. at 123) Additionally, he could ask Claimant to do something but then either would need to remind her again or would complete the task himself. (Tr. at 122) Mr. Hutson stated Claimant's memory problems were hard on him and his son because if they bring it to her attention, she will cry. (Tr. at 123)

    Patricia B. Posey, Vocational Expert ("VE") Testimony:

    The ALJ asked the VE if she understood that she needed to point out any conflicts between her testimony and the DOT. (Tr. at 124) The VE confirmed that she understood. (Tr. at 125) The VE then classified Claimant's past work as a claims examiner (DOT #241.267-018) at the skilled (SVP 7), sedentary level. (Tr. at 127) In response to the ALJ's controlling hypothetical, the VE testified that an individual with Claimant's vocational profile and RFC could perform work as a food sorter (DOT #521.687-086), a folder (DOT #685.687-018), and a polisher (DOT #713.684-038). (Tr. at 128) The VE stated that her testimony was consistent with the DOT. (Id.)

    The VE further testified that no work would be available for an individual who was off-task as much as 20 percent of the workday due to physical and mental symptoms. (Id.) Additionally, the VE indicated an individual with the controlling hypothetical who also needed close supervision and redirection would be unable to work in a regular setting and would benefit from a sheltered workshop. (Tr. at 129)

    As an additional condition to the controlling hypothetical, Claimant's representative asked the VE what would the effect on the ability to maintain employment be if due to marked limitations in the ability to complete work-like activities, that the individual would require the need to take

excessive breaks outside of regular scheduled break and lunch periods. (Id.) In response, the VE testified that the individual could not sustain gainful activity and placed this in the same area as the sustainability of 20 percent off-task. (Tr. at 130) The VE further stated that work would also be precluded for an individual who would miss work or be late more than two days per month. (Tr. at 130)

## Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

## Analysis

Evaluation of Opinion Evidence:

The Regulations provide the definition for "medical opinions":

Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. § 404.1527(a)(1). The Regulations further provide that "we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." Id. § 404.1527(b). "Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's medical opinion controlling weight . . . we consider all of the following factors in deciding the weight we give to any medical opinion." Id. § 404.1527(c). The Regulations govern how an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) including: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Medical opinions as they relate to a claimant's functional capabilities, therefore a "residual functional capacity . . . or the application of vocational factors" are determinations reserved solely to the Commissioner. Id. § 404.1527(d)(2). To that extent, an adjudicator is not bound to "give any special significance to the source of an opinion on issues reserved to the Commissioner." Id. § 404.1527(d)(3).

At step three in the sequential evaluation process, the ALJ performed the "special technique" under Section 404.1520a: in understanding, remembering, or applying information, the ALJ found that Claimant had a moderate limitation, noting that she alleged memory loss which was corroborated by Dr. Dunn's findings wherein she exhibited severe deficits in recent memory, though she also exhibited mild deficits in remote memory and no deficits in immediate memory.

(Tr. at 80, 273, 826) Moreover, the ALJ noted Claimant's admission that "she does okay at following short and simple instructions" (Tr. at 80, 276, 298)

In interacting with others, the ALJ found Claimant to have a moderate limitation, and noted that she reported to Dr. Dunn that she lived with her husband and son and got along with them, though she did "not really visit with anyone else." (Tr. at 80, 826) The ALJ also noted that in her Function Reports, Claimant stated that she attended soccer games once a week as well as church, and that her family takes her back and forth to Columbus for her doctor's appointments. (Tr. at 80, 275)

In concentrating, persisting, or maintaining pace, the ALJ found Claimant had a moderate limitation, noting that she alleged problems with concentrating and completing what she started and that Dr. Dunn also found that Claimant had moderately deficient concentration, but normal persistence and pace. (Tr. at 80, 276, 298[5], 825, 826)

Finally, in the area of adapting or managing oneself, the ALJ found Claimant had a moderate limitation, again noting that she reported to Dr. Dunn that she goes to doctor's appointments, straightens up her house, and watches television. (Tr. at 80, 826) The ALJ also noted that in her Function Reports that she admitted having no problems with personal care and does light cleaning and laundry once a week (Tr. at 80-81, 273, 295), watches television, reads Bible verses, and attends her son's soccer games. (Tr. at 81, 275)

Later in the written decision, the ALJ examined the mental health evidence, again noting Dr. Dunn's diagnoses that Claimant suffered from major depressive disorder and anxiety disorder

---

[5] The ALJ referenced Exhibit "5E, p.6", however, this appears to be a scrivener's error as this finding is actually supported in the record at Exhibit 8E, p.6.

secondary to her medical problems and loss of employment as well as the limitations to her mental discussed *supra*. (Tr. at 84)

Next, the ALJ discussed the treatment records from Worthington Management Company where Claimant reported memory loss after her June 2014 hospitalization. (Tr. at 84, 992) It was noted that these records indicated that Claimant was prescribed medications for her symptoms of ADHD and anxiety and that they helped calm her down as well as helped her sleep better and complete tasks. (Tr. at 84, 993, 994, 995, 1004) The ALJ noted that in October and November 2015, Claimant reported that the medication helped her with her concentration and mood. (Tr. at 84, 996) The ALJ acknowledged that subsequent Worthington Management Company records also indicated that Claimant suffered from "occasional panic", though she continued to endorse better sleep and had good focus. (Tr. at 84, 1298, 1384) The ALJ further noted that in May 2016, Claimant reported that her anxiety "comes and goes and does not stay like it used to" (Tr. at 84, 1300) and in November 2016, she "reported that she had a lot of people over for Thanksgiving and had a good time." (Tr. at 84, 1404) Ultimately, the ALJ determined that Claimant tolerated her medications well (Tr. at 85)[6], and that the records from Worthington Management Company "documented that her treatment regime helped calm her down, sleep better, and complete tasks." (Tr. at 85, 993, 994, 995, 1004) Again acknowledging that Claimant reported an occasional

---

[6] The ALJ referenced Exhibits 10F, p.2; 11F, p.2; and 14F, p.11, however, none of these records expressly support this particular finding, and there is no page 11 to Exhibit 14F. Again, the undersigned would note that this appears to be a scrivener's error. However, Worthington Management Company treatment notes identified in Exhibits 17F (Tr. at 973-1007), 19F (Tr. at 1298-1307), 23F (Tr. at 1374-1388), 25F (Tr. at 1402-1406), 27F (Tr. at 1413-1414), 30F (Tr. at 1441-1453), 31F (Tr. at 1454-1456), and 33F (Tr. at 1488-1506), which were all available to the ALJ for his review prior to issuing the written decision, indicate that Claimant did indeed tolerate her medication well, as her prescription for 25 mg Adderall XR was consistently continued from October 2015 through June 2017. Indeed, in treatment records submitted after the ALJ issued his unfavorable decision, Worthington Management Company providers indicated Claimant's medications continued unchanged from July 2017 through April 2018. (Tr. at 98-103, 50-60, 16-20)

increase in symptoms such as panic, the ALJ also noted that she "consistently reported that her sleep was better and her focus was good." (Tr. at 85, 1298, 1384) The ALJ further acknowledged that Claimant alleged continued issues with anxiety, depression, and PTSD. (Tr. at 85)

From this evidence, the ALJ determined that the psychological assessments provided by the State agency consultants, Drs. Bartee and Logan, were entitled to "great weight" "based on their professional expertise and detailed analyses." (Tr. at 85, 134-150, 152-167) The ALJ found that "their findings are consistent with the consultative examination by Dr. Dunn as well as with the treatment records from Worthington Management Company, which indicated that the claimant's treatment regime helped calm her down, sleep better, and complete tasks." (Tr. at 85, 993, 994, 995, 1004) With respect to Dr. Lee's opinion, the ALJ assigned it "little weight", and noted that "Dr. Lee's findings are inconsistent with Dr. Dunn's consultative examination report as well as with the claimant's treatment notes, which as mentioned above, showed her treatment regime helped calm her down, sleep better, and complete tasks." (Id.)

Claimant asserts that the ALJ impermissibly failed to assign any weight to the report provided by Paul Dunn, Ph.D., the State agency psychological consultative examiner. (ECF No. 13 at 9) The Commissioner counters that Dr. Dunn's report is not an "opinion" requiring the ALJ to assign weight. (ECF No. 14 at 10-11) As noted *supra*, the ALJ noted that Dr. Dunn found Claimant's concentration was moderately deficient, her recent memory severely deficient, her persistence, pace and immediate memory normal, and her social functioning and remote memory mildly deficient. (Tr. at 80, 84) Under the SSA's own definition of "medical opinion," it is clear that Dr. Dunn's evaluation report can be properly characterized as such, insofar as the report contains his findings and conclusions concerning Claimant's mental limitations and he provided

diagnoses based on his observations. Although the Commissioner is correct that the opinion provides nothing more with respect to what Claimant "can still do" despite these mental restrictions, however, Dr. Dunn did opine that Claimant is capable of managing funds if awarded benefits. (Tr. at 826)

Nevertheless, Dr. Dunn's report is a "medical opinion" and there is no dispute that the ALJ did not explicitly assign any weight to this opinion, accordingly, Claimant is correct that the ALJ's omission of assigning any weight to Dr. Dunn's opinion was erroneous. Dr. Dunn's report clearly provided one of the reasons for the ALJ when he assigned the State agency psychological consultants' opinions "great weight" and was also one of the reasons why the ALJ gave Dr. Lee's opinion "little weight." (Tr. at 85) Dr. Dunn's consultative report clearly supported the majority of the ALJ's findings in his discussion of the "paragraph B" criteria. (Tr. at 80) "Unless the Secretary has . . . sufficiently explained the weight he has given to *obviously probative exhibits*, to say that his decision is supported by substantial evidence approaches an abdication of the court's " 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cook v. Berryhill, 2017 WL 8895457, at *20 (N.D.W. Va. Dec. 27, 2017), *report and recommendation adopted by*, Cook v. Berryhill, 2018 WL 1010485 (N.D.W. Va. Feb. 22, 2018) (citing Gordon v. Schweiker, 725 F.2d 231, 236 (4th Cir. 1984) ("We cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." (quoting Arnold v. Secretary, 567 F.2d 258, 259 (4th Cir. 1977)) (*italics* supplied). In short, the undersigned **FINDS** the ALJ's omission of assigning weight to Dr. Dunn's opinion is error and frustrates this Court's application of the substantial evidence test.

Claimant further argues that the ALJ's evaluation of the opinion evidence from Drs. Bartee and Logan falls short of legal requirements insofar as the ALJ did not explain why he rejected other limitations noted by the psychological consultants. (ECF No. 13 at 12-13)[7] Specifically, Claimant argues that the ALJ did not adopt the additional limitations noted by Drs. Bartee and Logan: that Claimant should be limited to "brief, superficial contacts with supervisors and coworkers in a non-confrontational setting" (ECF No. 13 at 12; Tr. at 147, 166); and that she is further limited insofar as she would need to " 'adjust to infrequent, limited changes in routine and task structure' **but only 'if given time to become familiar**.' " (Id.) (emphasis in original) Both Drs. Bartee and Logan provided a mental residual functional capacity assessment based on the medical records at the initial and reconsideration levels of review and as noted *supra*, shared the same opinion as to Claimant's limitations and capabilities.

With regard to understanding and memory limitations, Drs. Bartee and Logan found Claimant was "not significantly limited" in her abilities to remember locations and work-like procedures and to understand and remember very short and simple instructions. They both opined Claimant was "moderately limited" in her ability to understand and remember detailed instructions and explained that she "can learn and understand simple, routine instructions, retaining 1-2 steps in memory." (Tr. at 146, 164)

With regard to sustained concentration and persistence limitations, Drs. Bartee and Logan found Claimant was "not significantly limited" in her abilities to carry out very short and simple

---

[7] The undersigned notes that it appears that Claimant's and the Commissioner's arguments on this issue do not track one another insofar as Claimant contends that the ALJ's failure to adopt additional limitations without explanation is akin to failing in his legal obligation to reconcile conflicting evidence that allows for meaningful review, whereas the Commissioner argues an adjudicator is not obligated to adopt every limitation in a medical opinion that is given great weight. (ECF No. 14 at 12-14) Indeed, Claimant concedes that the ALJ is not obligated to adopt the entirety of a medical opinion. (ECF No. 15 at 3-4)

instructions, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them, and to make simple work-related decisions. They both opined Claimant was "moderately limited" in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 146-147, 164) Drs. Bartee and Logan further explained that "Claimant can maintain sufficient focus to complete the tasks described above in a routine work-like environment with periodic breaks across a normal work-related schedule in a setting with minimal expectations for social interaction." (Tr. at 147, 164)

With regard to social interaction limitations, Drs. Bartee and Logan opined that Claimant was "not significantly limited" in her abilities to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. at 147, 165) They both opined that Claimant was "moderately limited" in her abilities to interact appropriately with the general public and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Id.) Both psychologists explained that "Claimant can maintain brief, superficial contacts with supervisors and coworkers in a non-confrontational setting. Contact with the general public should be minimal or avoided." (Id.)

With regard to adaptation limitations, Drs. Bartee and Logan opined that Claimant was "not significantly limited" in her abilities to be aware of normal hazards and take appropriate

precautions, to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others. (Id.) They both opined that Claimant was "moderately limited" in her ability to respond appropriately to changes in the work setting and explained that she "can adjust to infrequent, limited changes in routine and task structure if given time to become familiar." (Id.)

As discussed *supra*, the RFC assessment allows for Claimant's mental impairments by limiting her to "understanding, remembering, and carrying out simple instructions." This is consistent with the findings by Drs. Bartee and Logan that Claimant's abilities in this area were "not significantly limited." Next, the RFC limits Claimant to "completing simple, routine, and repetitive tasks and to performing work that does not involve a rapid pace or strict production quotas." This also comports with the findings by the psychological consultants' explanation that Claimant: "can learn and understand simple, routine instructions, retaining 1-2 steps in memory"; has "no significant limitation" in her ability to "perform activities within a schedule"; and "can maintain sufficient focus to complete the tasks described above in a routine work-like environment with periodic breaks across a normal work-related schedule in a setting with minimal expectations for social interaction."

The RFC also provided that Claimant be limited to "occasional interaction with supervisors and coworkers, and to no interaction with the public." This is consistent with the psychological consultants' findings that Claimant was "not significantly limited" in her abilities "to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, and to maintain socially appropriate behavior" as well as their finding Claimant had "moderate" limitations in her ability "to interact appropriately with the general public and to get

along with coworkers" and that she could "maintain brief, superficial contacts with supervisors and coworkers in a non-confrontational setting" and that her "[c]ontact with the general public should be minimal or avoided." Finally, the RFC limited Claimant to a "stable work environment where there would be only occasional changes to the routine work setting", which is not inconsistent with the opinion of Drs. Bartee and Logan that she is "moderately limited" in her ability to respond appropriately to changes in the work setting and explained that she "can adjust to infrequent, limited changes in routine and task structure if given time to become familiar."

In short, although the undersigned agrees with Claimant that an adjudicator is required to explain why certain limitations opined by the psychological or medical experts were not adopted, the limitations noted by the psychological sources are not inconsistent with those accounted for in the ALJ's RFC assessment.[8] With the exception of Dr. Dunn's opinion, addressed *supra*, the ALJ herein provided an adequate explanation for the limitations found with respect to Claimant's mental impairments and fairly accommodated them in the resultant RFC. To that extent, the undersigned **FINDS** substantial evidence supports the ALJ's consideration and evaluation of the State agency psychological consultants' opinion.

Finally, with respect to the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §

---

[8] Claimant references this Court's decision in <u>Haynes v. Berryhill</u>, No. 3:16-cv-02781, (S.D.W. Va. Mar. 1, 2017) (M.J. Tinsley), *recommendation adopted by*, <u>Haynes v. Berryhill</u>, 2017 WL 1089191 (S.D.W. Va. Mar. 21, 2017) (J. Chambers), that concerned an ALJ's failure to address inconsistencies in a consultative medical examiner's opinion and the resulting RFC despite the great weight given to the opinion. In the case *sub judice*, the ALJ rendered an RFC that was generally consistent with the limitations noted by the State agency psychological consultants because the evidence and resultant RFC were not "materially" inconsistent or ambiguous and thus triggering the application of SSR 96-8p requiring an ALJ to "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." (See, <u>Haynes v. Berryhill</u>, No. 3:16-cv-02781, ECF No. 12 at 10)

404.1527(c)(2).[9] Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. Id. § 404.1527(c)(2). Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id.

As noted *supra*, the ALJ gave little weight to the mental assessment provided by Claimant's treating psychologist, Dr. Lee, and noted his findings included:

> marked limitations in her ability to understand, remember, a[n]d carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek; and respond appropriately to changes in the work setting.

(Tr. at 85, 950-955) The ALJ determined Dr. Lee's opinion that Claimant had these "marked" limitations were inconsistent with Dr. Dunn's findings as well as with Claimant's treatment notes from Worthington Management Company. Specifically, the ALJ noted these records showed that Claimant's treatment regime helped calm her down, sleep better and complete tasks.

Claimant contends that the ALJ's valuation of Dr. Lee's mental assessment was inappropriate, given that several of his findings are actually supported by the findings provided by the State agency psychologists (ECF No. 13 at 13-15) and further, was the product of seizing upon

---

[9] The treating source rule has since been eliminated, effective March 27, 2017, however, because this claim predated this rule change, the pertinent Regulations in effect at the time apply. Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819, at *5853 (Jan. 18, 2017).

trivial inconsistencies in the treatment record while overlooking the record's broader import – that Claimant has demonstrated overall significant abnormal findings which were ignored. (ECF No. 15 at 4-5) With respect to Dr. Lee's opinion that Claimant exhibited the aforementioned "markedly limited" abilities in the areas of "understanding and memory", "sustained concentration and persistence" and "adaptation" (Tr. at 951-952), Dr. Dunn's report contains no equivalent corroboration for such findings, with the limited exception that Claimant exhibited "severely deficient" recent memory. (Tr. at 825-826) Moreover, neither Dr. Bartee nor Dr. Logan found Claimant to have any "markedly limited" abilities in any of those categories.

Significantly, as noted by the ALJ, Claimant's treatment records indicate that her medications did help with her sleep, did help calm her down, and did help her complete tasks. The undersigned notes that these records repeated this report over the course of Claimant's treatment at Worthington Management Company, discussed in greater detail *supra*, and further documented Claimant's report that her "concentration" and "focus" had improved with medication. (See, e.g., Tr. at 84, 85, 998, 100, 1004, 1006, 1414, 1446) Dr. Lee's findings that Claimant had "markedly limited" ability in maintaining attention and concentration for extended periods or performing activities within a schedule, appear to be undermined by these treatment notes. Additionally, though Dr. Lee diagnosed Claimant with ADD based on testing in March 2015, notably, Dr. Dunn specifically found that she did "not meet criteria for ADD." (Tr. at 826) In sum, the ALJ provided "good reasons" for discounting Dr. Lee's mental assessment and provided an adequate explanation for same allowing for meaningful review. See, DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983). The record of evidence on the whole does not suggest that the ALJ merely selected trivial or insignificant inconsistencies "[b]y relying on these limited observations to discredit the treating

31

source opinions . . . while overlooking the record's broader import . . . ."[10] In addition to Dr. Lee's own treatment notes, the ALJ considered the other psychological opinion evidence of record, as well as the other evidence of record which is noted in the ALJ's "paragraph B" criteria discussion (Tr. at 80-81), thus providing the necessary narrative in his ultimate determination that Dr. Lee's mental assessment was entitled to little weight.

Accordingly, the undersigned **FINDS** the ALJ's evaluation of Dr. Lee's mental assessment is supported by substantial evidence.

Claimant's RFC Assessment:

A claimant's RFC represents the *most* that the individual can do despite her limitations or restrictions. See SSR 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. § 404.1545(a). The RFC determination is an issue reserved to the Commissioner. Id. § 404.1527(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

As noted by Claimant, the ALJ found fibromyalgia, connective tissue disease, and osteoarthritis to be severe impairments at step two, but failed to include any corresponding

---

[10] Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018); Testamark v. Berryhill, 736 F. App'x 395, 398-399 (4th Cir. 2018).

manipulative limitations in the RFC assessment. (ECF No. 13 at 17) At step three, the ALJ specifically found that Claimant's severe impairments did not meet Listings requirements, including any "inability to perform fine and gross movements effectively[.]" (Tr. at 79) The ALJ acknowledged Claimant's testimony that she experienced "pain and tightness in her fingers and neck" as a result of her fibromyalgia. (Tr. at 82) The ALJ noted that Claimant testified about her activities of daily living, which included "light household chores such as dusting and light cooking." (Id.)

In his examination of the objective evidence of record, the ALJ noted the May 2015 consultative examination report provided by Dr. Nutter, who also recognized Claimant's osteoarthritis, among other impairments. (Tr. at 83) Dr. Nutter noted Claimant "had pain, tenderness, and decreased range of motion in the cervical and thoracic spine, but her straight leg raise was negative and sensory testing was intact." (Id.) It was further noted that Claimant had pain, tenderness, and decreased range of motion in her knees, "[h]owever, there was no rheumatoid nodules, capsular thickening, periarticular swelling, or tophi on examination." (Tr. at 83, 834) Next, the ALJ examined records[11] from Camden Clark Rheumatology where Claimant was diagnosed with fibromyalgia, and showed she exhibited no signs of lupus or inflammatory arthritis. (Tr. at 83, 1314, 1411) The ALJ noted that in "late 2016, early 2017", Claimant was started on Neurontin and Gabapentin, and that "at the time, she was stable with no signs of joint swelling." (Tr. at 83, 1394, 1408) Records from Mid Ohio Valley Medical Group showed that Claimant was prescribed Plaquenil in June 2017 for a diagnosis of mixed connective tissue disease, "[h]owever, that condition was noted to be stable as well." (Tr. at 83, 1514) After having determined that

---

[11] These records (Exhibits 20F, p. 7 and 26F, p. 5) are dated June 27, 2016 and January 23, 2017, respectively.

Claimant's alleged symptoms and limitations were not fully supported by the objective evidence, the ALJ noted that "x-rays of the hands and wrists showed no evidence of a significant arthritic process."[12] (Tr. at 84, 1316, 1317)

It is known that in addition to her burden of showing she has a medically determinable impairment, Claimant must demonstrate "a showing of related functional loss." See, Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (internal citation omitted). Despite Claimant's allegations of manipulative limitations, the medical evidence did not corroborate this. Although Dr. Nutter did find Heberden's nodes on Claimant's fingers on both hands and that her bilateral grip strength was rated a "4/5 with the Dynamometer readings", he also observed that Claimant "is able to write and pickup coins with either hand without difficulty" and that the range of motion in her fingers of both hands was "normal." (Tr. at 833) Though "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam)), it is necessary that an ALJ " 'must build an accurate and logical bridge from the evidence to his conclusion.' " Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). In this case, the ALJ's failure to mention any manipulative limitations in his RFC assessment is without error, because the medical record does not indicate such limitations.

Claimant also takes issue with the ALJ's acknowledgment that she had additional limitations beyond those found by the State agency medical consultants. (ECF No. 13 at 17) Notably, the record shows that Dr. Saima Noon and Dr. Thomas Lauderman found at the initial

---

[12] These records are dated May 19, 2016.

and reconsideration levels, respectively, that Claimant was capable of "light" work (Tr. at 148, 166), which the ALJ reduced to sedentary. (Tr. at 81) Significantly, however, neither Dr. Noon nor Dr. Lauderman found that the record supported any manipulative limitations. (Tr. at 145, 163) Understandably, the consultative medical consultants and examiner provided their opinions prior to the submission of additional medical evidence as it related to Claimant's hands and wrists, however, since their submissions, the additional objective evidence simply did not support Claimant's allegations of manipulative limitations. In short, the ALJ's finding that Claimant's alleged symptomatology was not supported by the objective evidence was sufficient explanation for the that allows for meaningful judicial review. Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). This Court is not "left to guess about how the ALJ arrived at his conclusions" therefore remand is not necessary. Mascio, 780 F.3d at 637.

In sum, the undersigned **FINDS** the RFC assessment with respect to Claimant's alleged manipulative restrictions is supported by substantial evidence.

DOT Consistency at the Fifth Step of Sequential Evaluation Process:

At the final step in the sequential evaluation process, the ALJ determined that Claimant could perform the full range of sedentary work. (Tr. at 86) The ALJ noted the vocational expert testified that there were several jobs which Claimant could still perform; the ALJ then determined that the vocational expert's testimony was consistent with the DOT. (Tr. at 87) However, Claimant argues that the ALJ did not follow the dictates of SSR 00-4p because the DOT descriptions of the identified jobs are not consistent with his RFC insofar as they require strict production quotas and a predetermined pace (food sorter, DOT #521.687-086) and an ability to perform detailed instructions (folder, DOT #685.687-018; polisher, DOT #713.684-038). (ECF Nos. 13 at 18 and

15 at 6)

With regard to the food sorter position, also called "nut sorter", the DOT provides the following job description: "Removes defective nuts and foreign matter from bulk nut meats: Observes nut meats on conveyor belt, and picks out broken, shriveled, or wormy nuts and foreign matter, such as leaves and rocks. Places defective nuts and foreign matter into containers." DICOT 521.687-086, 1991 WL 674226. The job involves performing "repetitive or short-cycle work" which requires frequent reaching, handling, and fingering, "from 1/3 to 2/3 of the time." Id.

Regarding the folder job, also called "lace winder", where duties include:

Tends machine that winds lace on cards: Inserts card in machine holder with end of lace next to margin and manually turns card to start winding. Depresses pedal to start machine and control speed, guiding lace across card until specified number of layers are wound. Examines lace for defects during winding and rejects unsatisfactory material.

DICOT 685.687-018, 1991 WL 678585. This particular job has a reasoning skill level assessed at 2, which requires an ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions[,] [d]eal with problems involving a few concrete variables in or from standardized situations." Finally, with regard to the polisher position, job duties include:

Polishes plastic eyeglass frames and temple pieces to remove scratches and pit marks, using polishing wheel: Applies abrasive compound to wheel surface, using brush. Starts machine and holds and turns frame parts against wheel to polish parts and remove defects. Inspects and feels polished parts to verify removal of flaws. Presses sandpaper against polishing wheel to remove abrasive residue in preparation for next sequence.

DICOT, 1991 WL 679297. As noted *supra*, the polisher position also requires a level 2 reasoning capability.

The Fourth Circuit has held "Although we could guess what these occupations require in reality, it is the purview of the ALJ to elicit an explanation from the expert ..." Pearson v. Colvin, 810 F.3d 204, 211 (4th Cir. 2015). The duty rests with

> the ALJ, not a reviewing court, to find facts and resolve conflicts. Radford, 734 F.3d at 296; see also Brown v. Colvin, 639 Fed. App'x. 921, 923, 2016 WL 50298, at *2 (4th Cir. Feb. 9, 2016) ("We remand to avoid engaging in fact-finding 'in the first instance' and to allow the ALJ to further develop the record so that we can conduct a meaningful judicial review"). And, as the Fourth Circuit has repeatedly made clear, the ALJ must provide a sufficient explanation of his findings to allow for meaningful appellate review. See Mascio, 780 F.3d at 637 ("Because we are left to guess about how the ALJ arrived at his conclusion on [Plaintiff's] ability to perform relevant functions and indeed, remain uncertain as to what the ALJ intended, remand is necessary."); Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986) (holding that without an adequate explanation, "it is simply impossible to tell whether there was substantial evidence to support the determination").

See, Cunningham v. Berryhill, No. 3:16-cv-02525, 2017 WL 1259587 (S.D.W. Va. Mar. 31, 2017) (J. Tinsley). The pertinent law clearly indicates that despite Claimant's counsel's failure to object to any apparent conflicts in the vocational expert's testimony at the administrative hearing, the omission is of no moment. "When a VE or VS provides evidence about the requirements of a job or occupation, *the adjudicator* has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT." See, Policy Interpretation Ruling: Titles II And XVI: Use Of Vocational Expert And Vocational Specialist Evidence, And Other Reliable Occupational Information In Disability Decisions, SSR 00-4p, 2000 WL 1898704, at *4 (emphasis added). As stated *supra*, it remains the exclusive duty of the ALJ to identify any conflicts in the evidence and to resolve them. Indeed, the burden of proof shifts to the ALJ at the fifth step of the sequential evaluation process, because "[i]n order to support a finding that you are not disabled at this fifth step . . . *we* are responsible for providing evidence that demonstrates that other work exists . . . that you can do, given your residual functional capacity and vocational factors." See, 20 C.F.R. § 404.1560(c)(2) (emphasis added).

Returning to the DOT descriptions of the jobs identified by the vocational expert, it is noted that the food sorter position does not contain any information regarding pace or quota requirements

that would give rise to an "apparent" conflict with the controlling RFC in this case. However, the fact that two of the jobs identified require the person to be able to understand and carry out "detailed but uninvolved written or oral instructions" appears to be in conflict with Claimant's RFC limitation to "simple instructions." It is not clear that the RFC limitation to this extent conflicts with the DOT, thus necessitating further clarification. See, e.g., Thomas v. Berryhill, 916 F.3d 307, 314 (4th Cir. 2019) (claimant being limited to "short, simple instructions, may not be able to carry out detailed but uninvolved instructions" was an apparent conflict).[13] Perhaps most problematic is that the folder position (DOT #685.687-018), also called "lace winder" is characterized as "light work", despite the ALJ's RFC explicitly limiting Claimant to less than a full range of sedentary work due to additional limitations. (Tr. at 86) For this position, the DOT expressly states, "[p]hysical demand requirements are in excess of those for Sedentary Work." See 1991 WL 678285.

Because the ALJ accepted the vocational expert's testimony and determined it was "consistent with the information contained in the Dictionary of Occupational Titles" (Tr. at 87), despite the fact that at least two of the jobs identified contain apparent and even obvious conflicts with the controlling RFC, the undersigned does not have confidence that Claimant could perform all three jobs without further clarification or resolution of these conflicts by the ALJ. Accordingly, the undersigned **FINDS** the ALJ's determination that the vocational expert's testimony was compliant with the DOT is not supported by substantial evidence.

<u>**Recommendations for Disposition**</u>

---

[13] The Commissioner asserts that Claimant's limitation to only "simple" instructions, not "short" and "simple" instructions, thereby renders <u>Thomas</u> not on point with this case. (ECF No. 14 at 19, n.2) However, this would be an oversimplification of the apparent conflict recognized by the Fourth Circuit, and would necessarily require this Court to engage in impermissible fact-finding.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's request for remand for the correction of these errors (ECF No. 13), **DENY** the Defendant's request to affirm the decision below (ECF No. 14), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings in order to allow for the proper evaluation of Dr. Dunn's psychological opinion in accordance with the Commissioner's own Regulations and for further clarification of the apparent conflicts in the vocational expert's testimony and the controlling RFC at the fifth step of the sequential evaluation process.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933

(1986); <u>Wright v. Collins</u>, 766 F.2d 841 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: April 2, 2019.

Omar J. Aboulhosn
United States Magistrate Judge